The Honorable Justice Robert D. McLaren presiding, along with Justices Anne B. Jorgensen and Liam C. Brennan. The case is number 219-1088, Jeffrey Roberts et al., plaintiff's appellants, v. Stephan G. Zimmerman et al., defendant's appellees. Arguing for the appellants, Jeffrey Platt. Arguing for the appellees, Stephan and Kathy Zimmerman, Timothy J. Klein. Arguing for the appellees, Thomas Zimmerman and Lake City Hardwood Company, Jordan Dorsky. Mr. Platt, you may proceed. Thank you, Your Honor. May it please the Court, Jeffrey Platt on behalf of appellants, plaintiffs, Jeff Roberts and John Johnson. There are two main issues here today. First issue is the reversal of the trial court's decision that there was no breach of judiciary duty with respect to count one of plaintiff's Fourth Amendment complaint against Stephan Zimmerman. And the second main issue is reversal of the trial court's dismissal of the Third Amendment complaint with prejudice, which contained additional counts against defendant Stephan Zimmerman for shareholder oppression and an aiding and abetting claim against Tom and Kathy Zimmerman. The first issue involves a garden variety breach of judiciary duty case. The trial court acknowledged this as much in its ruling, noting that, quote, under ordinary circumstances, the action of buying a substantial amount of product to benefit a family member rather than buying at the best market price would indeed constitute a breach of duty to the corporation and its shareholders. The trial court then erroneously found that this case did not present ordinary circumstances because the 1986 agreement somehow justified the conduct that would otherwise be a breach of judiciary duty. The problem is that the 1986 contract had no bearing on the issue of whether defendant breached his judiciary duties. Back in 1986, the parties here set up R. Woodlofts Limited, which I'll refer to as OWL, with the defendant as the two-third shareholder and the plaintiffs as a combined one-third shareholder. When they did that, an already existing business called Outstanding Woodlofts Inc., which I'll refer to as Outstanding, which was 100% owned by plaintiffs, helped defendant open OWL by loaning materials, providing cash, building infrastructure, providing customers and setting up processes and accounting, as well as providing $858,100 in inventory on an interest-free basis with no personal guarantee. Due to the investment by Outstanding in the business of OWL, the parties agreed that Outstanding could charge an inflated price for lumber that had sold to OWL. The plain language of the 1986 agreement provides that all products in inventory purchased from Outstanding Woodlofts Inc. shall be paid for by the instant business, which is OWL, at the rate of, quote, best price possible, close quote, as determined by the current Frank Paxton Lumber Catalog. That inflated price was referred to as the Paxton price, which included profit built into the price. This language is clear that OWL only has to purchase lumber from Outstanding Woodlofts at the Paxton price, not any other company, and certainly not Lake City Hardwood Company, which I'll refer to as Lake City, formed 26 years after this 1986 agreement was entered into. The only reason why Outstanding could charge the Paxton price was because it had made substantial investments in OWL and had an agreement with OWL. No other individuals or entities were a party to the 1986 agreement. Then we fast forward almost 30 years to 2012, and OWL starts buying lumber from a new company called Lake City. Lake City is owned by defendant Stefan Zimmerman's son, Tom Zimmerman. Tom is also an employee of OWL working as a lumber manager. So Tom, as an employee of OWL, starts buying lumber for OWL from his own company, Lake City, instead of just purchasing lumber for OWL in his job as lumber manager for OWL. But OWL wasn't buying lumber from Lake City at market price. OWL started paying an inflated price to Lake City instead, on average over 23% over market price. Unlike Outstanding, Lake City did not invest in OWL. In fact, Lake City is not providing anything of value at all to OWL in exchange for the inflated price. Defendant Stefan Zimmerman used Lake City as an unnecessary middleman to divert OWL's profits to his son, Tom. The trial court erred when it ruled that this case did not present the ordinary circumstances of a breach of fiduciary duty. This case presented the ordinary circumstances where a defendant bought substantial amounts of product from Lake City at an inflated price to benefit his son. This was, and continues to be, a breach of fiduciary duty that amounted to close to $800,000 for just the time period of 2012 to 2019. And the evidence presented at trial proved such a breach and damages. At trial, all the following things were proven. Defendant was a fiduciary. Defendant's son, Tom, has worked at OWL and continues to work at OWL as lumber manager. Tom's job was to purchase lumber for OWL. Defendant was responsible for overseeing all lumber purchases, including those by Tom. Tom set up Lake City as a side business with defendant's knowledge and consent. Tom purchased lumber for OWL from Lake City, his own company. The lumber purchased from Lake City was shipped directly to OWL from the seven vendors of Lake City. Lake City did not do anything to modify or increase the value of the lumber in any way. Lake City has no facility for processing or storing lumber. Lake City has only one customer, OWL, and only one employee, Tom, who works on average only five hours a week. Lake City does not advertise and is not on social media. Lake City, on average, charts over a 23% markup on the lumber it dropped shipped to OWL. Lake City purchased lumber from seven vendors, two of whom were already doing business directly with OWL. There was undisputed testimony from these seven vendors of OWL that they could have bought directly, that OWL could have bought directly from all of them at the same or lesser price as they were selling to Lake City. Had OWL not purchased lumber through Lake City, it would have had an increased profit from just 2012 to 2019 of close to $800,000. These facts proven at trial demonstrate the defendant breached his fiduciary duties by intentionally diverting nearly $800,000 in profits to his son. There was no reason to compare prices to the inflated Paxton price list in the 1986 agreement, as only outstanding was allowed by this agreement to charge OWL at the inflated Paxton price. The review of the trial court's interpretation of this 1986 agreement is de novo review. Reviewing the plain terms of the unambiguous contract, there was no way that this agreement could justify that OWL could pay Lake City the inflated Paxton price. This agreement should never have been applied in this case. If the inflated Paxton price is taken out of the analysis, there is no defense at all for defendant's conduct. The trial court's decision finding no breach of fiduciary duty by defendant Stefan Zimmerman should be reversed, and judgment entered for plaintiffs on this count, with remand to the trial court for calculation of updated damages, punitive damages, prejudgment interest, and attorney's fees. The second main issue here is that the trial court erred when it dismissed the third amendment complaint with prejudice. This dismissal is also reviewed de novo. Plaintiffs stated claims for shareholder oppression and aiding or abetting a breach of fiduciary duty, but these claims were erroneously dismissed with prejudice pursuant to a suit 2-615 motion to dismiss. Plaintiffs stated all the elements and underlying facts for each of the claims that were dismissed with prejudice. Therefore, plaintiffs request that the dismissal of the third amendment complaint be reversed so that the claims can be reinstated. There are also a number of ancillary evidentiary discovery issues that are also appealed, but those specific issues hinge on the reversal of the two main issues just discussed. The plaintiffs' appellants have now completed their introductory comments and would be happy to answer any questions from the judges. Thank you. Justice Jorgensen, do you have any questions? I do. You talked about the 1986 agreement. Did that agreement contemplate that OWL would buy all of its lumber from Outstanding? No, it did not. It was just going to be a primary supplier. It's not an exclusivity contract at all. So your position is there is no breach of the 1986 agreement, right? There's no breach of the 1986 agreement with respect to Outstanding being a primary supplier. We never made that an issue in the case. It was never in our complaint. It was never discussed at trial. But somehow it ended up in the trial court's decision. Some comments on that, but no, there wasn't. Yeah. No, that was... I'm sorry. It seemed like the trial court was focusing on the plaintiffs as individuals and any loss they may have had was their loss as shareholders of Outstanding. Can you tell me where that analysis is wrong? Well, I think the judge did rule properly that the loss here was to the corporation, but then she went on to say that she thought there were some extraordinary circumstances here, and the only thing... And complexities of the case, and she never explains what the complexity of the case is, but the extraordinary circumstances can only be this application of the Paxson price, which from a plain review of the language in the agreement, it's just wrong. The language of the agreement says clearly the products and inventory purchased from Outstanding shall be paid for at the best price possible as determined by Paxson. It doesn't say that our woodloft has to extend that price to anybody else. Right. But I thought what Judge Wheaton was saying is that to your client, any loss they sustained, any monetary loss, was a loss to Outstanding, not a loss to OWL. Well, I think that she brought up some ancillary issue to talk about that. She thought that if Outstanding could sell at the Paxson price, and then if OWL bought from Lake City at the Paxson price, there wouldn't be any damage, but that's just an incorrect reading of the contract, because as you noted already, Your Honor, Outstanding was not the exclusive sole provider. They were just a primary supplier, and so there were already other people that were supplying lumber. The only person that gets the justification of using that Paxson pricing, which is an inflated price that includes profit built into it, is Outstanding. It's not Lake City that was formed 26 years later, was not a part of this agreement, and can't take any benefit from it. All right. You keep going, man. I'm sorry, Judge. Go ahead. One other thing, Judge, that I apologize, the profits were to OWL. They weren't to Outstanding here. The profits were diverted from OWL. They weren't diverted from Outstanding. Because your position is that Outstanding was a provider to OWL, not the only. Correct. The language says shall serve as primary supplier, not exclusive supplier. Okay. So do you think the trial court assumed that Outstanding, at least initially, was to be the only provider? Yeah. I do believe, and that's what we call in our brief the phantom contract issue. We believe that the judge picked up on this and had a whole discussion of we didn't prove that we were the primary, the only supplier. We didn't prove the volume, all these different things, and it was never part of our claim. Our claim was simply that Lake City doesn't get the benefit of the Paxson price. Yeah. Her damage analysis was based on them being exclusive supplier, Your Honor, you're right, and it's incorrect. Okay. And you have mentioned a couple of times that the Paxson price is an inflated price, but I thought in Thomas' testimony, you know, he was all over the place, but he seems to say that, you know, the Paxson price is a good price. It's a fair price. Why do you maintain that it's an inflated price? Well, it's an inflated price because if you look at the affidavits from the seven vendors of Lake City, all of those vendors said they would have sold directly to R. Woodlaw at the same or lesser price that they sold to Lake City, and what Lake City did, Tom Zimmerman just picked up the phone and ordered lumber in his capacity as Lake City to get drop shipped to Owls, but he upcharged it over 23%. So that's the problem. I mean, if he had sold it at the exact same price the vendors could have sold it directly to R. Woodlaw, then there wouldn't have been an issue, but he upcharged it massively, and he didn't add any value to it. He doesn't have a storage facility, he doesn't modify the lumber, you know, he doesn't otherwise inspect it. It just comes directly to Owl, and then he's wearing his hat as an Owl lumber manager inspecting this lumber that was drop shipped by Lake City, so this over 23% upcharge is completely unnecessary. There was discussion about the difference in, and I'm no lumber expert by any stretch, but difference in some of the quality of the lumber, particularly Owl being sort of an upscale retail outlet for lumber. Did the court, do you think the trial court considered that? And does that matter? Well, I don't think, it doesn't matter because there's absolutely no difference in the quality of the lumber. If Tom Zimmerman is sitting at the Owl facility and picks up the phone and calls these seven vendors and says, I need 10,000 board feet of each of these types of lumber, ship it to Owl, or if he picks up the phone and says, hi, this is Tom from Lake City, and orders the same lumber, it's exactly the same quality. There is no quality difference. The defendants tried to allege that, that somehow it was better quality, and that was rebutted, you know, with the testimony at trial. Okay. Justice McClaren, I have no further questions. Thank you. Thank you, Justice Jorgensen. Justice Brennan, do you have any questions? I do. Thank you. So let me ask this, if Stephan was sitting at Owl and reached out directly to these seven vendors, the Paxton price, you couldn't argue breach of fiduciary duty because of the business judgment rule in that circumstance. Would that be fair? Well, if the inflated Paxton price was the best price available, and that's what's still – Hold on a second. Even if it wasn't, if he's just, as the manager, calling out to these people, not to vendors, that there's no family relationship, even if that was poor judgment from a management standpoint or a business standpoint, it would not be a breach of fiduciary duty under the business judgment rule. Would that be fair? Well, I think that it potentially could be, Your Honor. I mean, the business judgment rule only gives you a presumption, and that presumption can be rebutted by a number of things, and one of the things that can be rebutted with is, you know, when the transaction cannot be attributed to any rational business purpose. So, if there was a clearly better price out in the market, and he failed to do any due diligence to investigate it, then it could still be a breach of fiduciary duty. Do you think he could still be a breach of fiduciary duty in that context? I do. I do believe. I think there's an argument there that that transaction doesn't have a rational business purpose. He has a duty to maximize profits for the company, and if he's doing a poor job, you know, the business judgment rule, and this is the Stamp v. Touche Ross case, the business judgment rule says that he's doing a poor job of doing due care in their management of the corporation. Stefan Zimmerman was responsible for the day-to-day operations of the business. If he fails to exercise due care in the management, and he's buying, you know, high-priced, you know, items when he can get the exact same price, the exact same quality for, you know, 25% less, then, yeah, I would argue that's a breach of fiduciary duty. All right. Thank you. I have no additional questions. Thank you, Justice Brennan. Mr. Platt, did I hear you say that you didn't believe the Paxson price was relevant in these proceedings? Correct. We filed a motion to eliminate before trial to seek to exclude it. We filed that, again, at trial, and then, you know, we objected at trial to the Paxson price being brought in because we don't think that this Lake City company formed 26 years after this 1986 agreement has any basis to have the Paxson price applied to them. The defendant even testified he didn't have to pay them at the Paxson price. He was under no obligation. So, I mean, the Paxson price was completely a red herring. Would it be relevant for the establishment of damages to the extent that it would be relevant to the amount of money that Al might have paid as opposed to the amount of money that it did pay? No, the proper measure of damages here is clearly, you know, what the better price was. And the better price was from them. There's seven vendors here. And they all provided an affidavit and said, you know, if Tom Zimmerman had reached out, you know, on behalf of Al to them, he would have given them the same, you know, the same price he was giving to Lake City, who then marked it up. So, you know, the price that was paid was just, you know, was grossly inflated solely to benefit the defendant's son. Does it have any relevance to damages? I'm not sure that you answered the question. I know you said it was a red herring. No, I don't. I'm sorry. Go ahead. The payment of the Paxson price is, as I understand your argument, not relevant because the price Owl is the damages. Correct. And that's what our accounting experts from Selden Fox, you know, demonstrated, that the price they could have paid, and the judge even said in a ruling that that was the measure of damages, what price was paid and what price could have been paid. And our expert witnesses from Selden Fox laid out the correct measure of damages here, and their spreadsheet laying out those damages at close to $800,000 in lost profit was admitted by the court. And those damages are what they paid and what they could have paid. And we had direct, undisputed testimony from seven, you know, vendors all saying, yeah, we would have sold to them at the same or maybe even a lesser price than we sold to Lake City. So there was absolutely no need for this over 23% upcharge. Assuming arguendo that the Paxson price is irrelevant, was it not still referenced by the trial court judge in her ratio descendant day regarding the question of breach of duty? I'm not sure I understand your question. What do I put it this way? Let me put it this way. I think you've argued that the judges syllogism, her rationale for ruling was wrong. And it was wrong because it brought into account the Paxson price. As far as you're concerned, the Paxson price has nothing of any value whatsoever insofar as whether or not there was or wasn't a breach, even though the trial court said it was. Correct. That's correct. I mean, the judge said that. So if that is the case, then the only reason why the Paxson price is relevant is because of the false logic that the trial court used. Correct. I have no further questions. Justice Jorgensen or Justice Brennan, do you have any questions? I do not. I do not. Thank you. Thank you. Thank you, sir. You'll have an opportunity to make rebuttal later on. Thank you. Thank you. Mr. Klein, you have five minutes to make your argument relative to the parents of Thomas, Stephan and Kathy. You may proceed. Thank you. And good morning. I had the pleasure of representing Stephan Zimmerman, also known as Steve, and his wife And what I'd like to stress very briefly this morning is the slow development of the facts of this case. That is to say that in 1986, the critical business operating or business operation agreement was entered into, as everybody acknowledges, that's Exhibit 4, and paragraph 16.2, as recited by my opponent, says what it says. There's no dispute. So from 1986 to approximately 2012, or about 26 years, Powell paid the Paxton price to Outstanding Wood. In approximately 2016 or 17, the testimony was from Stephan that he started to complain about lumber quality to Jeff and John, and basically was told buy from whomever you want. Now, he always could, but he specifically, in the face of complaints, indicated to go ahead and do that. In about 2011, Tom Zimmerman came to work at Powell, and in 2012, he apparently approached his father, the president, about resourcing or other sources for good quality lumber. He reached out to a number of companies, as the record shows, about buying direct for Powell, and got refusals. So in 2012, he set up Lake City. The purpose of Lake City was to get quality lumber at or below the Paxton price and sell it to Owl, make it available to Owl. Recall that Tom had a history of working for Paxton. So from 2012 to 2019, Owl paid the Paxton price not only to Outstanding, which it continued up to the date of trial to purchase from, but also to Lake City, or even below the Paxton price to Lake City, as well as other vendors. So for approximately seven years before trial, Owl was buying from a number of suppliers, and the result when it purchased from Lake City was buying at or below the Paxton price. We went to great lengths during the entirety of this case through deposition testimony, as well as at least three motions for summary judgment, only the last of which was argued, to show in Exhibits 39 and 40 the differential from Paxton to the price charged by Lake City. And the court, while not making any finding, and we didn't ask for a finding, that Owl actually saved over $212,000 by purchasing from Lake City when compared to the Paxton price, but basically the court rightfully honed in on the Paxton price, and I think rightfully determined that whether the price was paid to Outstanding or the price was paid to Lake City, the net result is zero. Incorporated in that logic is if the Paxton price was paid to any supplier, the net result would be zero, given paragraph 16.2 of the Stock Purchase and Business Operations Agreement. Exhibits 39 and 40 illustrate the Paxton price when compared to Lake City. The Zimmerman family relationship had repeatedly been explored during the case and repeatedly rejected by the court. Judge Wheaton did not find that it was inappropriate for Tom to form Lake City. The plaintiffs did not contend, did not argue, that it was a business opportunity being absconded with or misused by Lake City. So the relationship, the familial relationship mattered zero in the court's analysis. Frankly, the ordinary circumstances that the court was, I think, hinging its ruling on was twofold. Number one, the defects in the plaintiff's presentation. The second page of her Honor's Order, which is C-4985, Volume 3, is replete with about a half a dozen references to what the court was trying to listen for. Instead, she recounts that the court heard no testimony, saw no evidence, was unable to determine, was not provided, also found lacking information. So that's part of the extraordinary circumstances, I believe. Secondly, the fact that there was a contract from 1986, a non-exclusive contract to pay the Paxton price, is also an extraordinary circumstance that takes it out of the normal fiduciary duty syllogism. Your time is up, so if you would close, please, and we will have questions. I'll close briefly, thank you. I would say that the standard of review here is whether her Honor made a finding against the manifest way to the evidence. Clearly in no way can it be said that Judge Wheaton's findings were arbitrary or unreasonable or not based in the evidence, nor that the opposite conclusions are clearly evident from this record. We respectfully request that the trial court's judgment be affirmed. Thank you. Justice Jorgensen, do you have any questions? Hugh, if I understood you correctly, you suggested in 2012 when Lake is incorporated, that at least to Owl, at anything lower than the Paxton price, is that correct? I believe that when Lake City was formed by Thomas Zimmerman in 2012, he had free hand to do whatever his business judgment required. Sell at a better price, higher price, lower price, sell to whomever he wanted. There was no contractual obligation between the two companies other than on a almost per maybe monthly invoicing. Okay, so when Lake sells to Owl, Lake's motivation is to make a profit? I would say that's generally true hopefully of all corporations. Right, and so when Stephan oversees those and sees that Owl is paying an inflated price compared to vendors, if it were a direct sale, tell me how that's not a breach of fiduciary duty? Sure, the testimony from Steve on that exact point was clear. He knew and all of the parties agreed, Jeff, John, Steve, all agreed since 1986, the benchmark they would use not only in the relationship with Outstanding, but really in relationship to all vendors was going to be the Paxton price. Steve was keyed in on that constantly. And again, the history through Exhibits 39 and 40 illustrates that Owl paid the Paxton price to Lake City or below, and to the extent it was below, it was arguably a savings in excess of $212,000. Wait, hold on a second, why would Owl pay below Paxton sometimes, but not always? Part of the reason, I believe, was that not all... Respectfully, is this what the evidence shows or is this your speculation? No, the evidence shows clearly that Owl paid more than the Paxton price in a very small percentage of instances because they couldn't get the same lumber from Paxton. So there was about a $10,000 over the course of seven years overpayment above Paxton. Otherwise, again, Steve's rationale in buying from Lake City or anybody else was, if I can pay the Paxton price, which is the benchmark, or below, I'll take it. Okay, I have nothing else then. Thank you. Justice Brennan, do you have any questions? I do, thank you. Is it correct that prior to Lakeside, with regularity, purchases would be made from various vendors below the Paxton price? I'm not aware of that. So the record doesn't tell us one way or another? I don't recall that it contains that kind of an inquiry, so I cannot say with certainty. The record did, the plaintiff's documentation regarding prices paid, though, did disclose that the vendors in certain circumstances would have provided the same materials at a lower price than the Paxton price. Is that fair? That's the contention that they made, and after the case was filed, they went out and shopped for these affidavits and then took the depositions. But I think the court has to, again, remember the history of this. Back in 2012, the testimony was that Thomas determined, from his experience having worked with Paxton, who these suppliers were, and he contacted them. And in 2012, they would not sell direct to Owl. So in order to get the quality and the product, he set up Lake City. After the fact, after the case is filed, with all due respect, I don't know any affiant potential salesperson who wouldn't give the same testimony and say, sure, I'll sell to anybody, and I'll sell at a better price. I think that has to be discounted, and I think the court, although not making a specific reference to that, made no reference, understanding that was the real dynamic here. Well, isn't the whole point of Outstanding, for example, asking for the Paxton price, recognizing that Outstanding would be getting a little more than perhaps it would get on the open market because of the relationship and providing the seed money and everything? I mean, isn't the point of that, doesn't that implicitly recognize that the Paxton price sometimes would not be the best price to get this quality material on the open market? Two points. You're exactly right. It's not the lowest price, if you will, although quality is a concern. But page one of the judge's order of November 14 specifically says that Exhibit 35 showed that the $858,000 figure that Outstanding supposedly fronted in initial startup, but she then goes on to say, quote, that figure is deceptive, however, because the value of inventory was regularly paid back to Outstanding Woodlooks by our woodloft. Essentially, the same sums were borrowed and paid several times over. Eventually, all the sums were paid back according to the trial testimony, end quote. So the purpose of that relationship and the payment of the Paxton price served its purpose. And for 26 years before Lake City came along, there weren't any issues and everybody understood that, you know, there was money going back. And what purpose did paying the Paxton price to Lakeside serve? As a comparative, Lake City charged at or below the Paxton price, which then, I believe, under business judgment rule or any other general business concepts, allowed Owl to determine whether it would buy from Lake City or not. And Lake City was not exclusive. Owl bought and continues to buy from other suppliers. That price comparison dynamic is always in play. But Lake City only sells to one customer, is that correct? That's the record, correct. All right, I have no additional questions. Thank you. Thank you. I have some questions. Council, what relevance does the Paxton price have? Complete relevance. It's the benchmark. Steve, John, and Jeff testified to it. I believe Tom may have as well, since he worked at Paxton. Benchmark, the record's replete with the word benchmark, meaning let's take a look at this and compare the activity with all suppliers, all vendors, all intercompany relationships. Did Thomas provide any consideration for contracting with his father or with Owl? Like Outstanding did? Yes, Thomas testified he is essentially a broker. And brokers in the lumber business are often non-brick and mortar entities. Often a laptop or a cell phone moving lumber from point A to point B. They don't need overhead. They don't need transportation. They find supplies of lumber and get it in the hands of companies like Owl to sell to the public. As a broker, an analogy would be a realtor, they put parties together. My point was, which you didn't answer or at least enlighten me about my concern, which is Outstanding apparently gave $800,000 plus other consideration in order to get an Outstanding as its primary seller or provider. And I was asking, what did Thomas provide Owl to gain his status as a broker selling only to Owl? Well, I apologize. I didn't perhaps make myself as clear as I needed to. Of the seven vendors, for example, that gave depositions, five of them for sure would have been or would be new suppliers to Owl. If Thomas had, for example, put any one of those five businesses in touch with Owl,  finding those sources, hopefully with the same quality of lumber in a timely delivery manner, again, I think the services of a broker are... Finding other sources isn't really relevant or material if the Paxton price is paid. Is that correct or incorrect? In other words, if the Paxton price is so important, what is important about getting five new sources? If supposedly they could have purchased this from old sources at the Paxton price, if the Paxton price is as important as you say it is? Well, I think it's important because the parties agree that it is. And it's... No, the parties didn't agree that it is. The parties only agreed insofar as Outstanding and Owl is concerned that Outstanding would be able to charge Owl the Paxton price. And the agreement, according to the principle of inclusio uneus exclusio altreus means that the only entity that could charge that price is Outstanding because there's nothing in the contract that indicates that anybody else can. So how do you reconcile the legal maxim that I've just related to granting anybody else the privilege, right, or responsibility to charge the Paxton price to Owl? Because I think the principle applies to paragraph 16.2 when the parties, for whatever their motivation back in 86, used the word primary and underlined it to mean non-exclusive. That speaks as loudly as the word primary. So I don't think it does prohibit anybody from using other supplier sources. And for 26 years, there weren't any issues that the record speaks of. It became an issue when Thomas Zimmerman formed Lake City. Until then, and frankly, after then with other vendors, the Paxton price isn't an issue. And I think Justice Jorgensen made an interesting comment when she asked about... Well, I'll leave it at that. Well, what you're saying, I think, is a syllogism that I'm having difficulty with, simply because the fact that only Outstanding is entitled to the Paxton price doesn't mean that Thomas is entitled to it or any other sellers are entitled to it. And if the principle is that Stephan is supposed to try and get the best price possible, he could have breached his duties relative to getting that price or exercising his business judgment, whatever, with not only Thomas, but with every other provider other than Outstanding. How do you reconcile that logic? You know, I can't because I don't think that the Paxton price per se is a breach of fiduciary duty. And that's essentially what's argued in the reply brief of the plaintiffs. And to say that, I think, is a bridge too far. It's a big player in the market. All of the market forces go into making decisions. And to say across the board that buying at the Paxton price has somehow violated the business judgment rule, I just think that... It doesn't necessarily because the Paxton price may or may not be the lowest price available. Correct? The Paxton price may or may not be the lowest price available. I would agree with that. Okay. But if it isn't the lowest price available, then the fact that the plaintiffs haven't also alleged the breach of fiduciary duty in other purchases, not through Thomas's business, but through every other business that Thomas purchased from, that Stephan was aware of, would have been a breach of fiduciary duty. Would it not? Well, except for the fact that Stephan, as president of the company, isn't micromanaging in a way that I think the plaintiffs want to suggest here. The... There are so many factors going into running a business that Stephan testified he had to rely on his managers, sub-managers, to make certain of these decisions. He's not looking at every single invoice. At least that was the testimony. Why would Stephan, if the only provider his company is required to purchase at the Paxton price is outstanding, why would Stephan agree to or impose the Paxton price with other vendors with whom he has not received consideration and who supposedly are offering both a Paxton price and possibly below? Well, again, I think consideration that we talked about in terms of the broker relationship is evident, is apparent in the relationship. Putting parties together is valuable. That's consideration. And if he's getting quality lumber in a timely manner and paying at or below the Paxton price, and again, we went through in Exhibits 39 and 40, a laborious analysis of whether the Paxton price was paid or below and came up with a conclusion that owl saved over $212,000 by purchasing from Lake City. Assuming arguendo that there was a breach of duty, what is the amount of damages that the owl should pay the plaintiffs based upon either the lowest price? Because you keep saying the Paxton price or below, and the point is that statement implicitly means that there is in fact a price below the Paxton price, does it not? Again, if Paxton didn't have it in stock or if Paxton didn't have a comparable number, the owl bought it from Lake City, I believe the answer was at or below what would otherwise have been the Paxton price. So is there always going to be potentially a better price or potentially a higher price than Paxton? I think we would all have to say that's what the market would suggest. If Thomas had put a fifth leg on a horse, we could argue about what the value of a fifth leg is, but since he didn't put a fifth leg on a horse and he didn't do anything other than order the goods, what quid pro quo transpired between Thomas and owl? Well, I understand that metaphor and I know Lincoln often used it as well. I still think there's a quid pro quo in brokering services. I think Lincoln used the argument that if a tail is a leg, how many legs? That is correct. Yeah, right, how many legs would an owl have? I agree. Okay. You're up on Lincoln, at least. He's our patron saint. Okay. Can you proceed with your answer, please? Again, I don't discount the value of brokerage services in this industry. I understand that market prices are going to potentially be higher or lower. I think the court in its half a dozen or so instances on page two of its judgment indicating what it failed to hear. No testimony, no evidence on the percentages of total purchases, high or low percentages from all vendors. That's a failure of the plaintiff to make its case. And I think that the court rightfully found the plaintiffs failed to meet their burden of proof. And again, I would conclude with a request that the court respectfully affirm her decisions in all references. I have a question about aiding and abetting for the claim that was raised against Thomas relative to aiding and abetting. Did he aid or abet by actually providing wood to Owl as its sole customer and charging a price higher than what supposedly providers have indicated they might have sold the same goods at a lower price? Well, Thomas and Lake City are not my client, Your Honor. I would defer if you don't mind an answer be given by his counsel. I'm sorry. That's right. It's Mr. Dorstein. I'm sorry. That's okay. That's okay. Okay. I have no further questions. Does the panel have any other questions? I do not. I do not. Thank you. Thank you. Thank you. Thank you, sir. Okay. Mr. Dorstein, is that the correct pronunciation of your name? It's Dorstein, sir. Thank you. Dorstein. Okay. Very good. You may proceed, Mr. Dorstein. Thank you. Relative to my clients, Thomas Zimmerman and Lake City, the fundamental issue is that count four of the third amended complaint for aiding and abetting the breach of fiduciary duty of Steve Zimmerman was predicated on the dismissed count one for breach of fiduciary duty against Steve Zimmerman. There's no dispute that that count was, in fact, dismissed. And the plaintiffs have failed to appeal the dismissal of that underlying breach of fiduciary duty count. We know under Illinois Supreme Court Rule 303B2 that they were required to specify the judgment or court thereof appeal from. We know from GMC versus Pappas that the notice of appeal confers jurisdiction only on the parts of the judgment specified. And we know from the notice of appeal filed herein that the judgment specified was only for the reversal of the Accordingly, there's no jurisdiction to reverse the dismissal of count one for breach of fiduciary duty. Nor have the plaintiffs argued in their brief that that dismissal was improper. They only argue as to counts two, three, and four. Accordingly, any argument that that dismissal was improper is waived under Illinois Supreme Court Rule 341H7. Now, this is critical because we know from the case of Chadha versus North Park Elementary and from A Communication Co. Inc. versus Vannuti that aiding and abetting is not an independent court. It must be predicated on an underlying court. And that aiding and abetting claim rises and falls with the underlying court. That's also implicit in the elements of the claim. The plaintiffs cited to Johnson versus Filler in their brief for the elements of the claim. And those claims include a requirement of an underlying principle violation. We see in element one that Tom and Lake City must have aided a defendant that performed a wrongful act that caused an injury. Element two, that the defendant was generally aware of their role as a part of the tortious activity. And in element three, the defendant knowingly and substantially assisted the principle violation. It's also embedded in the elements of the claim that you need that underlying principle violation. And the plaintiffs don't really address the elements of the claim. Today, they just kind of said, well, we established all the elements. But they don't say how. And they don't really in the brief either. In the brief as to element one, they say they satisfied it because the breach of fiduciary duty claim survived. But it did not. And they don't make any argument at all as to the second element, even though they admit in their brief that it's not clear which element was dismissed. So now they just leave this court to guess how the second element is satisfied, even though they know that could have been the whole reason that the claim was dismissed. Under their own case law, they also haven't pled substantial assistance at all. So based on that, the aiding and abetting claim, the dismissal of that must stand. Now, the remaining arguments they have are about what discovery or testimony they'd be entitled to if the dismissal is reversed. One of those is about Lake City's financial records and the offer of proof. In their original brief, they say the court refused to allow an offer of proof. Now they appear to concede that was wrong. In the reply, they come back in a complete 180, and they say that they gave an offer of proof. But they don't address the case law on why they met the specificity requirements of an offer of proof or anything like that. And their arguments about needing Lake City's records on tax deductions goes against their own position. Today they said the damage is what the better price was. And they said that their expert was right, that the damage was about the lost profits of Woodloft. Well, they don't need Lake City's tax documents showing tax deductions for that. If their damage focus is lost profits of Woodloft, then the damage focus is not the net profits of a third party that was not a defendant at trial in Lake City. Really, they're seeking an if Lake City's brought back in as a defendant in a later trial. The same is true for the pre-trial discovery. And just a quick couple points there. They're ignoring the fact that the subpoenas were quashed. And they also aren't addressing or rebutting the case law in our briefs saying that the documents they were seeking are of a privileged and confidential nature. Because of that, under this court's ruling in Carlson v. Jarasek, the documents have to not only be relevant but proportional. And they only address relevance. They never explain how eight years of credit card expenses, phone records, receipts, and tax deductions and personal bank records are proportional. They are not. So for all of these reasons, we suggest that the ruling below should be affirmed. Thank you. Thank you. Justice Jorgenson, do you have any questions? Thank you. I do not have any questions. Thank you. Thank you. Justice Brennan, do you have any questions? As it relates to that, I do not have any questions either. Thank you. I believe I'll ask the question that I asked. Pardon me, Mr. Klein. You're claiming that the aiding and abetting count cannot survive because the underlying or underpinning charge of breach of fiduciary duty was found not to have existed. Is that correct? That's correct, Your Honor. And more specifically, the fact that it's not being appealed, so it can't be reversed at this point. Well, assuming that you're correct, that seems to make some logical sense. But let's assume for the moment that when we do reverse, we find that there is a fiduciary duty. What's your response to the reversal and the fact that if there was in fact a breach of a fiduciary duty, how is it that your client is not liable as well? Well, the breach of fiduciary duty claim that went to trial in the fourth amended complaint is fundamentally different from the breach of fiduciary duty claim in the third amended complaint that my client was said to aid and abet. So, Your Honor, are you talking about reversing the ruling at trial on that fourth amended complaint breach of fiduciary duty so that I can answer the question specifically? I'm suggesting that if the trial court was incorrect on its determination that there are extenuating circumstances and that there was in fact a breach of duty by Stephan, that his son, your client, isn't also liable by aiding and abetting his failure to seek the best price available. Understood. Well, and as it relates to that portion of the claim, the allegation at the time was that Steve had a conflict of interest under section 8.60 of the Business Corporations Act. And the argument from the plaintiffs was that that conflict of interest was due to the family relationship that created a duty for Steve Zimmerman to disclose to the plaintiffs the proposed transaction of business with Lake City and Steve's family connection to Lake City and the business purpose of conducting business with or through Lake City. So, in addressing that and getting to the point of your question, Your Honor, I think that puts us in the realm of the Time Savers versus LaSalle Bank case. Because that case says you have to allege how the defendant that aided and abetted actually aided that purported breach. So, the purported breach here being Steve Zimmerman's duty to disclose. And the allegations here, similar to that in Time Savers. In Time Savers, the court finds that the defendant bank, the plaintiff failed to plead the defendant bank had substantially assisted with the underlying embezzlement and larceny and instead pled that the defendant had assisted in operating a separate business. It's a very similar thing here. There's no allegation of how Thomas or Kathy or Lake City substantially assisted Steve Zimmerman in failing to disclose the conflict of interest by virtue of the family relationship or a failure to disclose the transactions. In that respect, it's also very similar to the Johnson versus Filler case that the plaintiff... Also, I think you made your point, at least to the extent that you deflected my question. Because I mentioned the failure to seek the best price, not the Would you address whether or not it's relevant material or if there's any valid defense to the argument that he wasn't aiding and abetting in failing to seek the best price for the purchase of goods from places other than your client's business? Well, in a couple respects on that, when Steve Zimmerman is looking at what the best price is, he's doing it with the understanding that the shareholder agreement for the company actually defines best price possible in a document and it defines that best price possible as the Paxton price. I think that that can't be overlooked because he has the right as the president of that company to consider the knowing Paxton price in my mind is what we've all agreed is the best price possible. And then Tom Zimmerman helps him get... I'm sorry, who is we? Who is we? Who are you referring to when you say we are in agreement that the Paxton price is the best price possible? Because if we are all in agreement, then I don't understand why this case was even brought. Because I thought the best price possible and that's evidenced by the amount of profits that Thomas's business made when it bought at a price and sold at a higher price to Stephan and Owl. So who is we in this? When I say we, I mean the shareholders that entered into that charter as the shareholder agreement for the corporation. Where does it say anything other than insofar as outstanding is concerned that other providers will get the same privilege and right to sell to Stephan at the Paxton price? It doesn't say that, but it certainly doesn't say they don't get to sell at that price. That's true, but if they don't get to sell at that price, that would be at least consistent with the concept that a director and managing stockholder is seeking the most profit available. Is that not correct? Is that not consistent with the idea or the principle that in a capitalistic society that profits are very important as opposed to merely abiding by an agreement with a party that you're going to accept less than the best price possible? I think you're correct that it is an important part of the consideration, but it certainly isn't the only part of the consideration, your honor. Businesses are obviously also concerned about quality of product, timeliness of delivery, relationships. As you and I know, relationships in an industry are a driving factor all the time and who people go with. Well, I don't know many better relationships than blood or affiliation, so you're kind of undermining your argument when you're saying what you're saying that relationships are very important. When Tom is the son of Kathy, that argument isn't working with me as far as relationships are concerned. The panel might accept it, but I don't, so I have no further questions. Are there any other questions from the panel? I have no additional questions. Thank you. Nor do I. Thank you. Thank you. Thank you, sir. Thank you. Mr. Platt, you have the opportunity to make rebuttal. Thank you, your honor. First, I'm going to try to get through all these different things. Mr. Klein's argument that Tom Zimmerman needed to somehow act as a broker for Lake City and he's working in a broker's role, that was his job at R. Woodlaw. He was the lumber manager. That was to find vendors to buy lumber from, so he didn't need to set up a side company to do his own job. At page nine of our brief, we talked about what he said when he started Lake City in 2012. He claims he set up Lake City to purchase lumber from sawmills that would not sell to OWL, and he identified those sawmills as Columbia Forest products, timber products, and Tumac sawmills. Instead, he purchased from the seven vendors who all gave undisputed evidence depositions that said they would have sold to OWL at the same or lesser price, and in fact, already two of those vendors were already selling to OWL. So this idea that, oh, he's a broker and this is what brokers do, it doesn't fly. That was his job as a lumber manager. Mr. Klein also mentioned their Paxton price analysis that Defendant Stefan Zimmerman put in, and we demonstrated in our brief, and the defendants did nothing in their reply to say anything other than, well, it's an abusive discretion standard or a clearly erroneous standard. The defendant's purported analysis doesn't even use the Paxton price. It uses vendors like Rainer, Bluelink, Aetna, Alexandria, Source. Then when they did their analysis, we went through a number of examples where they didn't use comparable volumes. When you're comparing a purchase at 4,000 units versus 500 units, the defendant admitted that the volume makes the price adjust. Larger volume, you get a better price. So the volumes weren't even correct. Then there's a number of instances where he didn't even use the actual product or a similar product. And then the defendant even admitted there were a number of numbers from checks and various invoices in his report that were inaccurate. So even if somehow we get to magically say that Lake City formed 26 years later after the 1986 agreement gets to use the Paxton price, they didn't even demonstrate that it was sold at or Paxton. Mr. Klein also claimed that Steve knew that the benchmark was the Paxton price, and that everybody knew that was the benchmark, and somehow that that means that's for trying to get the best price out there in the market. They never cite to the record for any of that, so I have no idea where that comes from, and that was certainly not the testimony of the two plaintiffs here. Mr. Klein also made some comment about the judge saying, well, the $858,000 in inventory, it was all paid back, and she doesn't bother to mention that it was interest-free and without a personal guarantee, but he also completely ignores all the other things that they provided customers, set up the processes and accounting. So in addition to the inventory, which was the only thing the judge mentioned, there was lots of other consideration that was provided. And then Mr. Klein made a comment about the percentage of purchases wasn't demonstrated. As a number of the justices have pointed out here, this was not an exclusivity contract. The 1986 agreement is clear, Outstanding is a primary supplier, not the exclusive supplier. So those percentages and those numbers are completely irrelevant. With respect to Mr. Dornstein's comment about the not appealing the count for breach of fiduciary duty in the Third Amendment complaint, it could not have been appealed from. It wasn't dismissed with prejudice. And he doesn't say how it's any different than the claim that went to trial. So there is a basis for the aiding and abetting, and if you look at the allegations in our aiding and abetting count, each of Kathy Zimmerman, Tom Zimmerman, Lake City knew, understood, and intentionally ignored their actions and properly diverted profits from R. Woodlaw, that their actions had been intentionally hidden from and not disclosed to R. Woodlaw's board of directors, and that their actions and those of Stephon Zimmerman were wrong for unauthorized and proper. I would submit that we've more than well pled the claim for aiding and abetting. And in the instance where the court doesn't think it's well pled, we should have at least an opportunity to replete it. It was the first time that this cause of action was pled. As far as the financial records, we tried to make an offer of proof, and those weren't accepted. The financial records are relevant for Lake City and the emails and all the other documents that were asked for, because one of the things that we intend to show with the aiding and abetting is that Lake City is a sham company. So showing that it only has one customer, showing that it only has one employee, showing that they have numerous purported deductions to their tax return, which are just false, is all part of showing that it's a sham. And the allegation by Mr. Dornstein that somehow the 1986 agreement says that the Paxon price is the best price, there's a reason it's in quotes. It's not the best price possible, and the language is clear that only Outstanding gets to use that price when it sells to Owl, not any other company. Counselor, your time is up. Would you close, please? I think for all these reasons, Judge, I think it's clear that we've demonstrated that there's a clear breach of our fiduciary duty here, and we've demonstrated the damages clearly with our Selden Fox report, and we're asking for a reversal of the breach of fiduciary duty and remand to the trial court for updated damages, punitive damages, and attorney's fees under the common fund doctrine, and also a reversal of the dismissal of the counts in the third amendment complaint. Thank you. Thank you. Justice Jorgensen, do you have any questions? I just have one question. You suggested that you have properly appealed the issue with respect to that. Yeah, my comment there, Justice Jorgensen, was that the dismissal of the count one of the third amendment complaint for breach of fiduciary duty was a dismissal without prejudice. So defendant's counsel is saying that we should have appealed that. We couldn't appeal it. It wasn't a final judgment. And your position is you repled that in your fourth amendment? Right. We repled it into the fourth amendment complaint, and it's the same count for breach of fiduciary duty that went to trial. So assuming that the court would reverse that, then there will be the predicate necessary for the aiding and abetting claim. All right. Thank you very much. I have no other questions, Justice McClaren. Thank you, Justice Brennan. Do you have any questions? I do not. Thank you. Counsel, what is your response to Mr. Dorstein's claim that you failed to properly appeal the judgment entered on the breach of fiduciary duty? Well, yeah, that's what we were just discussing. The dismissal of count one of the breach of fiduciary duty was without prejudice. So we didn't have an ability to appeal from that. It wasn't a final judgment. And what is your response to the argument that if the trial court were to be affirmed that you would have no cause of action because you can't aid and abet someone that hasn't done something? Well, I mean, there was also two in the third amendment complaint, there was two additional claims that we've appealed for under 12.56 for shareholder oppression. So the aiding and abetting could attach on to those claims, assuming that those are reversed and we're allowed to reinstate those. So there would be a separate basis aside from the breach of fiduciary duty. Thank you. I have no further questions. Does the panel have any other questions? I do not. I do not either. Thank you. Thank you. Thank you, counsel. We'll take the matter under advisement. Caplan, you may close out the proceedings. Thank you.